```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA


PATRICK LAVECCHIA, et al.      :      CIVIL ACTION
                               :
          v.                   :
                               :
CHRISTIAN C. FLEMING, et al.   :      NO. 22-390
```

MEMORANDUM

Bartle, J.                                            January 9, 2023

   Plaintiffs Patrick Lavecchia and his spouse Abigail Case bought a home from defendants Christian C. Fleming and his spouse Ashley A. Fleming in Radnor Township, Delaware County, Pennsylvania in July 2021. All did not go well thereafter. Plaintiffs assert defendants made material representations about the condition of the property. Plaintiffs have sued for rescission of the transaction as well as for restitution of the purchase price and restitution for certain other incurred losses.

   The court has subject matter jurisdiction under 28 U.S.C. § 1332(a). The plaintiffs are citizens of Pennsylvania, the defendants are citizens of Massachusetts, and the amount in controversy exceeds $75,000 exclusive of interest and costs. The court tried the action without a jury and now makes the following findings of fact and conclusions of law.

I.

In February 2021, the defendants decided to sell their home in Radnor where they had resided since 2009. On February 10, 2021, they completed and signed a seller's property disclosure statement. In that statement, they made various representations about the history and condition of the property. Among the representations were the following:

- that their roof was installed in 2009;
- that "the roof or any portion of it" had <u>not</u> "been replaced or repaired" during their ownership;
- that the roof <u>never</u> leaked during their ownership
- that the only current or past "problems with the roof, gutters, flashing or downspouts" was that the "ice dam in gutter on back bay window in 2010 [was] repaired";
- that they were <u>not</u> "aware of any water leakage, accumulation, or dampness within the basement or crawl space";
- that they were <u>not</u> aware "of any repairs or other attempts to control any water or dampness problem in the basement or crawl space";
- that they were <u>not</u> "aware of any past or present movement, shifting, deterioration, or other problems with walls, foundations, or other structural components";
- that they were <u>not</u> "aware of any past or present water infiltration in the house or other structures, other than the roof, basement or crawl spaces";
- that they were <u>not</u> "aware of any fire, storm, water or ice damage to the property";
- that they were <u>not</u> "aware of any defects (including stains) in flooring or floor coverings";
- that they were <u>not</u> "aware of any past or present drainage or flooding problems affecting the property"; and

-2-

- that they were <u>not</u> "aware of any material defects to the property, dwelling, or fixtures which are not disclosed elsewhere on this form."

In the disclosure statement, the sellers represented that the information set forth therein "is accurate and complete to the best of the seller's knowledge." The buyer, in signing the receipt of the disclosure statement, acknowledged that the disclosure statement

> is not a warranty and that unless stated otherwise in the sales contract, Buyer is purchasing this property in its present condition. It is the Buyer's responsibility to satisfy himself or herself as to the condition of the property. Buyer may request that the property be inspected. . . .

Plaintiffs were interested in purchasing the property and visited it on March 12, 2021. Their visit was brief. They stayed between 15 and 25 minutes and saw nothing out of the ordinary. They received from their realtor a copy of the seller's disclosure statement on March 13, 2021 and signed the receipt of it on March 14, 2021. The defendants had a strong preference for offers without contingencies and were reluctant to accept any offer contingent on a home inspection. Plaintiffs were eager to buy at this point and were ready to forgo a home inspection, in part, because they had lost a bid on a different home due to their home inspection contingency. Instead, plaintiffs relied on the completed disclosure form to determine

if there were any significant issues with the house.  There appeared to be none of any consequence.

On March 14, 2021, the parties signed an Agreement for the Sale of Real Estate in which the plaintiffs waived a home inspection.  The plaintiffs visited the property a second time for about 20 minutes in June to take measurements.  They viewed the first floor and master bedroom but did not go into the garage or basement.  A final visit was made just before settlement.  The house was empty except for the garage which was still filled with defendants' furniture.  Settlement occurred on July 9, 2021.  Plaintiffs paid the defendants $1,002,000, which was $103,000 more than the asking price.  In total, plaintiffs spent approximately one hour at the property before settlement.  At no time did they see anything that contradicted the disclosure statement.

The day after settlement, plaintiffs brought in Frank Castiglione to inspect the home.  He identified several indicators of water damage during a visual inspection of the home.  These included:  (1) moisture on the exposed brick; (2) water stains around windows; (3) water stains on the ceilings of the master bedroom, second bedroom, and office; (4) a stain on the wall of the fourth bedroom; (5) a sign of a leak on the ceiling of the dining room; and (6) stains in the garage.  He also recommended that plaintiffs hire a roof inspector.

On July 21, 2021, plaintiffs hired Joseph Fiorelli of Mold Solutions and Inspections to conduct a second visual inspection of the home. Like Mr. Castiglione, he found signs of water damage in the home. In the basement, he identified: (1) water stains along windows, on the baseboard of the stairs, and on a wall of the basement bedroom; (2) efflorescence on the walls of the unfinished portion of the basement; and (3) a dent in the ceiling of the basement bathroom. In the garage, he documented a large, dark stain on the wall near the stairs that led into the interior of the house. In the remainder of the house, he noted: (1) a stain near the ceiling of a hallway closet on the second floor; (2) signs of water damage at the top of a bay window; (3) signs of water damage near a skylight in the master bathroom; and (4) signs of water damage around spotlights in the second bedroom.

Plaintiffs lived in the house from shortly after the closing in early July until mid-August when they moved out because they believed the house was unsafe due to possible mold and water intrusion. They returned to the house on September 1, 2021 to pick up some of their belongings and witnessed active water leaks in both the basement and a second floor bedroom. Later that month, on September 23, 2021, Mr. Fiorelli returned to the house and also witnessed active water leaks in the basement and a second floor bedroom. He had to place a 5-gallon

bucket on the floor of the bedroom to catch the leaking water. Although these water leaks occurred during the significant rainfall that followed hurricane Ida, there had also been significant rainstorms in prior years. That day, Mr. Fiorelli completed a more invasive inspection, which included removing dry wall and testing samples for mold. Ultimately, he found pervasive water damage and mold in several areas of the home. He completed mold remediation over the next two days.

Based on the recommendations from their home inspectors to have the roof inspected, plaintiffs hired Michael Johnson of Johnson Electrical, LLC for this purpose. He conducted his initial inspection in late October and two more inspections by late November. He concluded that the roof needed to be replaced immediately. Plaintiffs heeded his recommendation and engaged him to replace the roof in early December 2021 for a cost of $46,596. This sum was almost twice what other roofers had estimated to plaintiffs to do the job. Mr. Johnson also removed and covered over two skylights during this process.

Plaintiffs moved back into the house in early December 2021 after the roof had been replaced and there were indications that the interior air quality had improved. It was their intent to make it their home. However, shortly after they returned, Dr. Case experienced an electric shock after plugging a

nightlight into a charger that was connected to a wall outlet in one of the bedrooms. This incident was the tipping point. Plaintiffs moved out again on December 13 and have lived in a rental property thereafter.

Defendants had installed a new roof in 2009, shortly after they had purchased the property. Although defendants may not have been aware of the water damage and mold behind their basement walls, they admit to having experienced several "water events" during their decade in the home. In 2010, Ms. Fleming's mother noticed that a washer hose in the first-floor laundry room leaked and turned off the water in the laundry room. When Mr. Fleming returned home, he saw that the water had leaked through the ceiling of the basement bathroom. He took down the wet portion of the sheet rock, leaving the insulation above in-place. Defendants did not replace the missing piece of the ceiling until February 2021. Also in 2010, the ice maker in the kitchen refrigerator leaked onto the kitchen floor and through the basement ceiling. After turning off the water source for the refrigerator, Mr. Fleming applied spackle to the ceiling to repair the damage from the leak.

In 2011, defendants experienced water intrusion through the rear bay window in the living room due to an "ice dam" that had formed. They hired a roofer to make repairs. Between 2013 and 2015, Mr. Fleming's mother was staying in a

second-floor bedroom when she noticed a stain adjoining two of the high hats in the ceiling.  According to Mr. Fleming, he saw no water leakage in the attic.  He cleaned a clogged gutter and monitored the stain but determined that it was not an ongoing issue.

Defendants also experienced water trouble in their garage.  Ms. Fleming told Gregory Grosso of Rutter Roofing--who defendants hired in February 2020 to replace windows in the home--that defendants had experienced a leak in the roof of the garage that required repairs by a handyman.  Mr. Fiorelli had noted in July 2022 that the ceiling of the garage above the entryway showed signs of repair, as there was both unfinished and unpainted drywall in different colors.  As noted above, Mr. Fiorelli also identified a large dark stain on a wall in the garage near the entryway to the house.  There appeared to be mold.

Of these events, only the 2011 ice dam incident was reported on their disclosure statement.  Mr. Fleming had been involved over the years in painting the house and making other repairs himself.  Given defendants numerous home repair and improvement projects throughout their time in the home, they had knowledge at least about various water leaks, including those in the roof and garage.

II.

The Pennsylvania Real Estate Seller Disclosure Law ("RESDL"), 68 Pa. Cons. Stat. § 7303, requires the seller of residential real estate "to disclose to the buyer any material defects with the property known to the seller by completing all applicable items in a property disclosure statement." The Residential Real Estate Transfer Law, 68 Pa. Cons. Stat. § 7102, defines a "material defect" as:

> A problem with a residential real property or any portion of it that would have a significant adverse impact on the value of the property or that involves an unreasonable risk to people on the property. The fact that a structural element, system or subsystem is near, at or beyond the end of the normal useful life of such a structural element, system or subsystem is not by itself a material defect.

Pursuant to the RESDL, a completed disclosure statement signed and dated by the seller must be delivered to the buyer prior to signing any agreement of transfer. Under § 7304(b), the disclosure statement requires disclosures covering seventeen subjects. The seller's duty to provide a disclosure statement with the required notification of material defects known to the seller is mandatory. Providing a disclosure statement cannot be waived. Phelps v. Caperoon, 190 A.3d 1230, 1238 (Pa. Super. Ct. 2018).

Under § 7308 the sellers have no duty to "make any investigation or inquiry" in order to answer the questions. Nonetheless the sellers must not make any false, deceptive, or misleading representations and must disclose any known material defects.

Section 7311 provides that anyone "who willfully or negligently violates or fails to perform any duty" under the RESDL shall be liable "for actual damages suffered by the buyer." Significantly, this section also states that it "shall not be construed so as to restrict or expand the authority of a court to impose punitive damages or apply other remedies applicable under any other provision of law."

In addition to the statutory damage remedy provided under the RESDL, Pennsylvania has long recognized the equitable right of rescission. Rescission is the unmaking or annulment of a contract. See, e.g., Coram Healthcare Corp. v. Aetna U.S. Healthcare, 94 F.Supp. 2d 589, 595-96 (E.D. Pa. 1999); Keenheel v. Com., Pennsylvania Sec. Comm'n, 579 A.2d 1358, 1361 (Pa. Commw. Ct. 1990).

One of the leading Pennsylvania rescission cases is La Course v. Kiesel, 77 A.2d 877 (Pa. 1951). In that action, plaintiffs executed an agreement to purchase a private home that one of the defendants had represented was zoned to permit apartments. The agreement of sale provided that it was being

sold subject to existing zoning regulations. Thereafter while applying for title insurance plaintiffs learned that the property could be used only as a single residence. Plaintiffs sued for rescission and for certain expenses. The defendants argued, among other things, that no material misrepresentation occurred because they did not know of the zoning restriction. The Pennsylvania Supreme Court, in affirming the plaintiffs' right to rescind, rejected this argument:

> A material misrepresentation of an existing fact confers on the party who relies on it the right to rescind whether the defendants here actually knew the truth or not, especially where, as here, they had means of knowledge from which they were bound to ascertain the truth before making the representation. Misrepresentations made under such circumstances are fraudulent and have been variously called implied, constructive or legal fraud or fraud in Equity but even where innocently made, if material, are nevertheless grounds for rescission.

77 A.2d at 880 (citations omitted).

The Court went on to explain:

> But the word 'fraud' is a generic term which embraces a great variety of actionable wrongs. As hereinbefore pointed out the fraud may be actual or constructive, accordingly as it is knowingly or innocently made, and where, as here, it is made by one having means of knowledge at hand, he cannot be heard to say he did not know what he should have known. Misrepresentation under such circumstances is fraud in law as well as in equity.

Id. at 881 (citations omitted).

Thus, to succeed on a claim for rescission, a plaintiff must establish not only a material misrepresentation, which may have been innocently made, but also reliance. See Bortz v. Noon, 729 A.2d 555, 563-565 (Pa. 1999). With respect to reliance, Pennsylvania has adopted Restatement (Second) of Tort, §§ 540 and 541. See Silverman v. Bell Sav. & Loan Ass'n, 533 A.2d 110, 115 (Pa. Super. Ct. 1987). Section 540 provides:

> The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

Section 541 states:

> The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.

In addition, the plaintiffs must do more than prove a material misrepresentation and reliance. They must also demonstrate that the parties can be restored as nearly as possible to their original positions with regard to the subject matter of the contract. See Coram, 94 F.Supp. 2d at 595-96; Keenheel, 579 A.2d at 1361.

Restitution accompanies rescission and is a remedy designed to thwart unjust enrichment. See Umbelina v. Adams, 34 A.3d 151, 161 (Pa. Super. Ct. 2011). Thus, if a claim for

rescission is meritorious, a plaintiff is also entitled to restitution although not to damages. Boyle v. Odell, 605 A.2d 1260, 1265 (Pa. Super. Ct. 1992). Restitution includes the right of the buyer to recovery of the purchase price as well as expenses incurred as a result of misrepresentations, such as interest, mortgage payments, taxes, and insurance. See, e.g., DeJoseph v. Zambelli, 139 A.2d 644, 649 (Pa. 1958); Boyle, 605 A.2d at 1265; Silverman, 533 A.3d at 112.

As noted above, the RESDL supplements but does not supersede other remedies provided by law. Pennsylvania permits plaintiffs who are the subject of a material misrepresentation in a residential real estate transaction to elect to recover damages or to obtain equitable rescission including restitution. The material misrepresentations in a recission action, unlike the material misrepresentations under the RESDL, do not have to be made knowingly. See La Course, 77 A.2d at 879-80; Growall v. Marietta, 931 A.2d 667, 673 (Pa. Super. Ct. 2007). While plaintiffs may plead in the alternative, they may not have the benefit of remedies which are inconsistent. Election of remedies is designed to prevent double recoveries for a simple wrong. See Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P., 217 A.3d 1227, 1234-35 (Pa. 2019); Umbelina, 34 A.3d at 157; Wedgewood Diner, Inc. v. Good, 534 A.2d 537, 539-41 (Pa. Super. Ct. 1987). Here the plaintiffs elected in their

complaint the remedy of rescission which includes restitution and have waived any right to damages under the RESDL.  The waiver, of course, does not preclude plaintiffs' reliance on any false responses by defendants in the disclosure statement as the source of the material misrepresentations to support their rescission claim.

The court finds by clear and convincing evidence that defendants made material misrepresentations about known water leakage in the ceiling of a second-floor bedroom, the basement, and the garage in addition to innocent misrepresentations about the mold behind the drywall in the basement.[1]  Plaintiffs' proof of the material misrepresentations has exceeded what is required for rescission since as noted above innocent misrepresentations will suffice.  In the disclosure statement, the defendants only acknowledged the ice dam incident.  Defendants knowingly and falsely denied:

- that "the roof or any portion of it" had "been replaced or repaired" during their ownership;
- that the roof had leaked during their ownership
- that there were other "problems with the roof, gutters, flashing or downspouts" in addition to the ice dam incident;
- that they were "aware of any water leakage, accumulation, or dampness within the basement or crawl space";

---

1. Under Pennsylvania law, plaintiffs asserting certain fraud-based claims must prove these elements by clear and convincing evidence.  EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 275 (3d Cir. 2010).

- that they were aware "of any repairs or other attempts to control any water or dampness problem in the basement or crawl space";
- that they were "aware of any past or present water infiltration in the house or other structures, other than the roof, basement or crawl spaces"; and
- that they were "aware of any fire, storm, water or ice damage to the property."

Plaintiffs reasonably relied on these untruthful representations in making the purchase of the property in issue and would not have entered into this transaction had they known the truth. While they waived a home inspection, they were under no obligation to have one or otherwise to make an independent investigation. Their visits to the house before settlement were brief and cursory. The falsity of the misrepresentations made by defendants was not obvious. The Pennsylvania Supreme Court explained in Lake v. Thomspon, 77 A.2d 364, 366 (Pa. 1951): "Consummation of a purchase and sale should not be dependent upon the fortuitous circumstance that a purchaser be available when rain or snow happens to fall so that it can inspect the roof and cellar to determine whether the roof is watertight and the cellar dry."

The court must now determine whether the parties can be returned as nearly as possible to their original positions. See Coram, 94 F.Supp. 2d at 595-96. Recission, as previously noted, constitutes the voiding or unmaking of a contract. A contract can be unmade or voided only if the court is able to

restore the parties as nearly as possible to their original positions at the time of the settlement on July 9, 2021.

The court recognizes that a buyer who is subject to a material misrepresentation may have to decide whether to make significant improvements to prevent the property from deteriorating or to make it habitable before and while pursuing a lawsuit against the seller.  It may not be possible to maintain the status quo ante and return the parties to their original positions or close to their original positions.  When such a situation arises, the remedy of rescission may not fit the circumstances, and the buyer must be left to sue for damages.

While plaintiffs did not have a home inspection before settlement, they paid for an extensive home inspection a few days after they moved in.  By mid-September at the latest, they were fully aware of the material misrepresentations of the defendants on which they had relied.  With this knowledge, plaintiffs opted to do the following:  (1) replace the roof of the house for $46,596; (2) remove drywall from the ceiling and walls in the garage, living room, second floor closet, and basement; (3) complete mold remediation; and (4) remove two roof skylights and cover them over. These changes cost $50,378.  Thus, plaintiffs seek to return the property to defendants in an improved state and to receive in return as restitution not only

-16-

the purchase price, but also the cost of the new roof and other significant upgrades to the house.

Because of their knowledge of some of the misrepresentations, plaintiffs first moved out of the house in mid-August 2021. Nonetheless, they made the improvements thereafter as noted above. They returned to live in the house in early December after the new roof had been installed. Shortly thereafter, plaintiff Abigail Case received a shock when she attempted to plug a nightlight into a charger that was connected to an electrical outlet. She was concerned for the safety of her young children. As a result of this new concern on top of what had already occurred, the plaintiffs again moved out on December 13 and have been living in a rental property ever since. There is no claim that the malfunction of the outlet was the subject of any wrongdoing by defendants. In fact, it was later confirmed that there was nothing wrong with the outlet.

The court simply cannot restore the parties to their original positions or close to their original positions that existed at the time of the settlement on July 9, 2021.[2]

---

2. In addition to the purchase price of $1,003,000, plaintiffs' restitution claims include an additional $126,329.37 broken down as follows:
        1) $12,019.59 for taxes and insurance
        2) $25,250.42 for mortgage interest
        3) $46,596.00 for the new roof

the purchase price, but also the cost of the new roof and other significant upgrades to the house.

Because of their knowledge of some of the misrepresentations, plaintiffs first moved out of the house in mid-August 2021. Nonetheless, they made the improvements thereafter as noted above. They returned to live in the house in early December after the new roof had been installed. Shortly thereafter, plaintiff Abigail Case received a shock when she attempted to plug a nightlight into a charger that was connected to an electrical outlet. She was concerned for the safety of her young children. As a result of this new concern on top of what had already occurred, the plaintiffs again moved out on December 13 and have been living in a rental property ever since. There is no claim that the malfunction of the outlet was the subject of any wrongdoing by defendants. In fact, it was later confirmed that there was nothing wrong with the outlet.

The court simply cannot restore the parties to their original positions or close to their original positions that existed at the time of the settlement on July 9, 2021.[2]

---

2. In addition to the purchase price of $1,003,000, plaintiffs' restitution claims include an additional $126,329.37 broken down as follows:
    1) $12,019.59 for taxes and insurance
    2) $25,250.42 for mortgage interest
    3) $46,596.00 for the new roof

Case 2:22-cv-00390-HB   Document 42   Filed 01/09/23   Page 18 of 19

Plaintiffs seek to return a property to the defendants which they greatly improved after learning of the misrepresentations and then have the defendants return not only the purchase price but also pay them for the improvements.  The court cannot turn back the clock as a result of what has happened since plaintiffs became the owners.

The court certainly does not condone the material misrepresentations of the defendants, and plaintiffs may well have been entitled to damages for defendants' wrongdoing. Instead, plaintiffs elected to pursue rescission.  Yet they opted to upgrade the house rather than try to maintain the status quo pending the outcome of a lawsuit.  Fully aware of the defendants' material misrepresentations, they made significant improvements and remediation to the property, moved back into the house with the intent to remain, and only thereafter changed their minds and vacated the property for a reason that is in addition to the defendants' misrepresentations.  Unfortunately for plaintiffs, these facts do not fit the requirements for the

---

 4) $1,008.60 for water services
 5) $2,470.00 for electrical services
 6) $3,782.00 for additional repairs to the property
 7) $2,434.36 for landscaping/lawn care
 8) $32,400.00 for plaintiffs' rental payments at another property
 9) $218.40 for renters' insurance
 10)  $150.00 for the fee for the rental application

-18-

unmaking of their contract with the defendants and for restoring the parties to anything close to their original positions.

### III

Accordingly, the court will enter judgment in favor of defendants Christian C. Fleming and Ashley A. Fleming and against plaintiffs Patrick Lavecchia and Abigail Case.